# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOAQUIN ROCES et al.,

        Plaintiffs,

  vs.

RENO HOUSING AUTHORITY,

        Defendant.

3:15-cv-00408-RCJ-WGC

**ORDER**

This is a consolidated employment action, primarily for the collection of unpaid wages under the Fair Labor Standards Act ("FLSA") and Nevada law. Now pending before the Court are competing motions for summary judgment. (Pls.' Mot. Summ. J., ECF No. 81; Def.'s Mot. Summ. J., ECF No. 82.)

## I.    FACTS AND PROCEDURAL HISTORY

Defendant Reno Housing Authority[1] (hereinafter "RHA") is a municipal corporation established and operated to alleviate housing shortages and provide affordable housing options within the cities of Reno and Sparks and throughout Washoe County, Nevada. RHA owns and manages 764 units of public housing in multiple locations throughout Washoe County, and offers subsidized housing to more than 2,500 low income families in the Reno-Sparks metropolitan

---

1  Defendant's official name is Housing Authority of the City of Reno. (Def.'s Mot. Summ. J. 2, ECF No. 82.)

area. (Jones Decl. ¶¶ 3–6, ECF No. 84-3.) At issue in this case are five of the apartment complexes managed by RHA: Essex Manor, Yorkshire Manor, Tom Sawyer Village, Silverada Manor, and Stead Manor.

Plaintiffs are five individuals who entered into "Live-In Agreements" with RHA. Under these Agreements, Plaintiffs received rent-free housing in exchange for undertaking the responsibility to perform certain regular work within the complexes they inhabited. From April 2010 until August 11, 2015, Plaintiff Joaquin Roces was the "live-in" responsible for the Essex Manor and Yorkshire Manor complexes, comprising 142 total housing units. (3:15-cv-408 Second Am. Compl. ¶ 6, ECF No. 54; Def.'s Mot. Summ. J. 5.) From October 2007 until July 31, 2013, Plaintiffs Juan and Judith Lopez were the live-ins at Tom Sawyer Village and Silverada Manor, comprising 250 units. (3:15-cv-408 Second Am. Compl. ¶¶ 7–8, ECF No. 54; Def.'s Mot. Summ. J. 5.) And from August 2012 until May 2016, Plaintiffs Jaime Villa and Melisa Chavez were the live-ins at Stead Manor, comprising 96 units. (3:16-cv-441 Compl. ¶¶ 6–7, ECF No. 1; Def.'s Mot. Summ. J. 5.)

Under the Agreements, the duties of a live-in are as follows: The live-in must conduct a daily grounds inspection, paying specific attention to exterior light fixtures, the security of vacant housing units, and any vehicles or tenant activity in violation of RHA rules and regulations. (Agreement ¶ 2B, ECF No. 83-4.) The timing of the daily inspection is flexible, however, and the live-ins are largely able to decide when to complete it. (*See* Roces Dep. 89:22–90:16 (one inspection daily, any time between 6 a.m. and 7 p.m.), 149:14–16 (one inspection daily, any time before 11 p.m.), ECF No. 87-1; Villa Dep. 113:13–114:4, ECF No. 92-1 (one inspection daily, at varying times of day, with one "late" inspection over the weekend); Acosta Decl. ¶ 8, ECF No. 84-4 (one inspection daily, at the live-in's convenience).) In conjunction with the daily grounds inspection, the live-in must complete a vehicle log report, and a building and

1  grounds report (otherwise referred to as a property inspection report), each of which are turned in

2  daily to RHA management. Incident reports may also be necessary, depending on the

3  circumstances. (Roces Dep. 165:3–167:6, ECF No. 87-1.) Also, in conducting the grounds

4  inspection, the live-in is expected to clean up the grounds as needed, by, for example, shoveling

5  snow, throwing away trash or debris, clearing fallen tree branches, or picking up stray toys left in

6  common areas. (*See id.* at 180:15–25; Agreement ¶ 2C.)

7       Surely, the live-in's central duty is to be RHA's on-site "eyes and ears" outside of regular

8  business hours. To that end, live-ins are required to be "on-call" to respond to emergencies every

9  day from 6:00 p.m. to 7:00 a.m., and around the clock on weekends and holidays. (Agreement ¶

10  2A.) During their on-call hours, live-ins must be "available to answer, respond to and take

11  appropriate action in a timely manner with respect to any emergency call" received. (*Id.*) The

12  Live-In Agreement clearly permits live-ins to leave the premises during on-call hours, but they

13  must be reachable by telephone and must remain "close enough to respond within no more than

14  fifteen minutes."[2] (*Id.* at ¶ 2D.) Live-ins are not required by the Agreement to fulfill any

15  affirmative duties during the on-call hours; rather, their purpose is to be near enough to respond

16  quickly to emergency situations that may arise. Tenants experiencing an emergency are supposed

17  to dial an RHA telephone number or contact Answer West—an answering service used by RHA

18  for after-hours calls—and then the message is relayed to the live-in. The live-in is then expected

19  to investigate the situation and abate minor emergencies if possible. If unable to abate the

20  emergency, the live-in must report it to RHA's Asset Manager so a decision can be made

21  regarding how and when to resolve the issue. (*See, e.g.*, Jones Dep. 43:4–47:6, ECF No. 86-1.)

22  / / /

23

24

---

2  In prior versions of the Agreement, the minimum response time required was ten minutes.

On August 11, 2015, Joaquin Roces filed a collective action complaint against RHA alleging failure to pay wages and overtime in violation of the FLSA and Article 15, Section 16 of the Nevada State Constitution ("the Minimum Wage Amendment" or "the MWA"). (3:15-cv-408 Compl., ECF No. 1.) His complaint alleged that Mr. Roces worked 153 hours a week for RHA (40 during regular business hours and 113 on call) without hourly compensation, and further alleged that his unit's maximum rental value is $600, resulting in an effective wage rate of $0.92 per hour. On September 29, 2015, Juan and Judith Lopez joined in Mr. Roces's wage-and-hour allegations, and Mr. Roces added individual claims of FLSA retaliation, discrimination and retaliation under Nevada law, and tortious discharge in violation of public policy. (3:15-cv-408 Am. Compl., ECF No. 16.) On January 26, 2016, the Court denied Plaintiffs' motion to circulate a notice of the pendency of collective action under the FLSA to putative class members, holding that Plaintiffs failed to make "substantial allegations that they are similarly situated to the putative class members as victims of a single decision, policy, or plan." (Order, ECF No. 37.) Then on June 25, 2016, Jaime Villa and Melisa Chavez, represented by the same attorneys as the other three Plaintiffs, filed a separate action alleging the same wage-and-hour claims. (3:16-cv-441 Compl., ECF No. 1.) On September 19, 2016, the actions were consolidated under the first-filed case number.

The parties have now moved for summary judgment.

## II. LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A

1    principal purpose of summary judgment is "to isolate and dispose of factually unsupported

2    claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

3          In determining summary judgment, a court uses a burden-shifting scheme. The moving

4    party must first satisfy its initial burden. "When the party moving for summary judgment would

5    bear the burden of proof at trial, it must come forward with evidence which would entitle it to a

6    directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v.*

7    *Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks

8    omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

9    defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

10   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

11   party failed to make a showing sufficient to establish an element essential to that party's case on

12   which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

13         If the moving party fails to meet its initial burden, summary judgment must be denied and

14   the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*,

15   398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the

16   opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v.*

17   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the

18   opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient

19   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

20   differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

21   F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary

22   judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*,

23   880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and

24

allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the non-moving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## III.   ANALYSIS

### a.  Statute of Limitations

The Court will first address the statute of limitations issue relevant to the complaint of Juan and Judith Lopez. It is undisputed that the Mr. and Mrs. Lopez terminated their contract with RHA as of July 31, 2013, and this action was filed on August 11, 2015. (Lopez Dep. 70:21–22, ECF No. 89-2.) Under Nevada law, a two-year statute of limitations applies to actions for unpaid minimum or overtime wages. NRS 608.260; *Perry v. Terrible Herbst, Inc.*, 383 P.3d 257, 262 (Nev. 2016) (holding that claims arising under the MWA are subject to a two-year statute of limitations). Therefore, the Lopezes' failure to commence an action on or before July 31, 2015, is fatal to their state-law claims. Plaintiffs have conceded as much in their response to RHA's summary judgment motion. (Resp. 30 n.39, ECF No. 101.)

/ / /

With respect to the Lopezes' federal-law claims, the FLSA has a two-year statute of limitations for claims of unpaid minimum or overtime wages unless the employer's violation was "willful," in which case the statute of limitations is extended to three years. 29 U.S.C. § 255(a); *Flores v. City of San Gabriel*, 824 F.3d 890, 895 (9th Cir. 2016), *cert. denied sub nom. City of San Gabriel, Cal. v. Flores*, 137 S. Ct. 2117 (2017). "A violation of the FLSA is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (brackets and quotation marks omitted) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). In assessing willfulness, "merely negligent" conduct is not enough, *see McLaughlin*, 486 U.S. at 133, and a court "will not presume that conduct was willful in the absence of evidence," *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005). "An employer's violation of the FLSA is 'willful' when it is on notice of its FLSA requirements, yet takes no affirmative action to assure compliance with them." *Flores*, 824 F.3d at 906 (citation omitted). However, the "failure to seek legal advice, alone, without prior notice of the alleged FLSA violation does not prove willfulness." *Mohammadi v. Nwabuisi*, 171 F. Supp. 3d 545, 550 (W.D. Tex. 2016), *aff'd*, 673 F. App'x 443 (5th Cir. 2017). "The plaintiff bears the burden of proof on the issue of willfulness for statute of limitations purposes." *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (citations omitted).

Plaintiffs seem to argue that RHA's conduct was willful in this case because: (1) RHA conceived, implemented, and perpetuated the live-in program for several years without inquiring whether the program was legal under the FLSA; (2) RHA received complaints from Plaintiffs that should have put it on notice of FLSA compliance issues; and (3) live-ins provide great value to RHA by performing duties that are of the same nature as duties typically inherent in an employment relationship. (*See* Resp. 29–32, ECF No. 101.) Of course, the purpose of the live-in

program is to kill two birds with one stone: maintain a "management presence" on the premises after hours while saving RHA the expense of additional staffing. To that end, the program offers a valuable benefit to both parties. The live-ins save money in the form of rent (which they would have to pay but for the Agreement), and RHA saves money in the form of wages (which it would have to pay but for the Agreement). Certainly, if the live-in program did not exist, RHA would have to bring in additional employees or independent contractors to perform the same functions. RHA does not argue the contrary.

However, the fact that a live-in's duties would otherwise be completed by an employee is not alone sufficient to put RHA on notice that the live-in program implicates the FLSA. Indeed, former Executive Director David Morton, who established the live-in program, testified that he simply did not view the live-in arrangement as an employment-type relationship that would be subject to FLSA requirements:

> Plaintiffs' Counsel: Why did you create the live-in program?
> Mr. Morton: Because I thought it would be a very useful and helpful way of ensuring that our residents lived in complexes where they felt comfortable after-hours.
> Q: The live-in program, the live-in is not — I understand you don't believe that the person is an employee; is that correct?
> A: That is correct.
> Q: Why do you believe that person is not an employee?
> A: Because they had a lease, a rental agreement that clearly spelled out their duties in return for the apartment.

(Morton Dep. 30:8–20, ECF No. 85-1.) In fact, other than two sections specifying the live-in's duties and certain days of the year on which the live-in would not be required to perform them, the Live-In Agreement reads much like a standard lease. (*See* Agreement, ECF No. 83-4.) For example, Section 1 contains RHA's promise to permit the tenant to occupy a particular unit, free of rent. Section 4 specifies that the Agreement will create a tenancy at will. Section 5 institutes a five-day notice period for a termination by either party, and provides that such notice, if given by

RHA, will also represent a five-day notice of eviction in accordance with Nevada law. Section 7 imposes various rules and use restrictions that are common in residential lease agreements, such as a restriction on assignments and subleases, an obligation to abide by applicable housing codes affecting health and safety, and prohibitions on waterbeds and barbecues.

In reality, there is no evidence in the record of circumstances sufficient to put RHA on notice that it needed to inquire further into whether the live-in program was in compliance with the FLSA. *See* 29 C.F.R. § 578.3(c)(3). The mere nature of the program and governing Agreement is not enough. Whether Plaintiffs became employees of RHA by virtue of their Live-In Agreements is a complex question of law and fact—murky waters that even the attorneys in this case have thus far declined to wade into.[3] Mr. Morton testified that he believed RHA was entering into lease agreements with its live-ins, not employment agreements. There is certainly some nuance to the arrangement: Was RHA agreeing to provide free housing as an alternative to paying wages, or to accept certain specified services as an alternative to collecting rent? In Mr. Morton's mind, it was the latter. Plaintiffs have not offered any evidence to contradict Mr. Morton's testimony, and the Court does not believe a reasonable juror could conclude that his interpretation of the Live-In Agreement was so unreasonable as to support a claim of willful violation of the FLSA.

Because the parties' have not addressed it, the Court need not resolve the ultimate question of whether the Live-In Agreement created an employment-type relationship to which the FLSA applies. Nor does the Court need to answer the more difficult and fact-based question—assuming the Agreement did not create a relationship governed by the FLSA—of

---

3 Although RHA notes it has not waived the argument that Plaintiffs were not employees, it does not make the argument a basis for requesting summary judgment, and does not brief the issue in its motion. Rather, RHA approaches the motion on the assumption that the FLSA is applicable. (Mot. Summ. J. 12 n.1, ECF No. 82-1.)

whether an employment relationship arose at any subsequent time by virtue of the level of control RHA may have exercised over Plaintiffs. The Court need only determine whether there is sufficient evidence that RHA was on notice that it had possible FLSA obligations and failed to take affirmative steps to ensure compliance. Mr. Morton's uncontradicted deposition testimony establishes that RHA believed it was entering into lease agreements with its live-ins under which the requirement of paying rent would be substituted by the lessee's agreement to provide certain services. No reasonable juror could find that RHA's failure to inquire into its possible FLSA obligations under what it determined to be a lease agreement was unreasonable, much less in reckless disregard for whether its conduct was prohibited by the FLSA.

Of course, the Ninth Circuit has found that an employer's implementation of a new pay policy may itself be enough to put the employer on notice of a need to inquire into FLSA compliance. *See, e.g., Flores*, 824 F.3d at 906. However, according to the cases the Court has found, such a conclusion has only been reached where the employment nature of the relationship was already established, i.e., where the employer knew the FLSA applied to the relationship. In *Flores*, for example, the Ninth Circuit affirmed the district court's finding of willfulness where it was "undisputed that the [employer] failed to investigate whether its exclusion of cash-in-lieu of benefits payments from the regular rate of pay complied with the FLSA at any time following its initial determination that the payments constituted a benefit." *Id.* However, *Flores* is not similar to this case. The employer in *Flores* was clearly on notice that its benefits payments needed to conform to FLSA requirements. Here, it was not at all clear to RHA that the FLSA even entered into the equation. Accordingly, the Court finds the mere nature of the relationship created by the Live-In Agreement was not enough to put RHA on notice of any possible FLSA requirements.

This leaves only Plaintiffs' assertion that complaints they made to RHA while acting as live-ins were sufficient to give rise to RHA's obligation to inquire further into its FLSA

compliance. Two of the Plaintiffs—Mr. Roces and Mrs. Lopez—claim they lodged complaints with RHA management regarding their compensation. (*See* Roces Dep. 145:10–146:8, ECF No. 87-1; Roces Dep. Vol. II 92:8–93:15, ECF No. 88-2; Judith Lopez Dep. 62:3–63:14, ECF No. 89-2.) First, however, Mr. Roces's alleged complaints are not relevant to the timeliness of the Lopezes' FLSA claims. Plaintiffs' evidence establishes that Mr. Roces first complained about his compensation approximately six months prior to his termination. (Resp. 3, ECF No. 101.) This places his first complaint in or around early 2015. Mr. and Mrs. Lopez resigned from the live-in position in July 2013. Even if the complaints of Mr. Roces were sufficient to put RHA on notice of a possible FLSA violation, such notice came far too late to serve as a basis for establishing a willful violation of the Lopezes' FLSA rights.

The only other complaint was made by Mrs. Lopez herself, who testified that after a difficult night of dealing with a fight between tenants, which necessitated the presence of the Reno Police Department (a "night of hell"), she asked RHA Asset Manager Walter Dixon, "When are we going to get paid for this job?" In reply, Mr. Dixon laughed and said, "You're not management." (Judith Lopez Dep. 62:3–63:14.) She never brought up the subject again. (*Id.* at 64:16–22.) The Court finds that such an ambiguous and casual comment as this—which is inadequate not only to communicate the substance of a wage complaint but even to convey that the employee is raising a serious issue—is not sufficient to put an employer on notice of a possible FLSA violation. Mrs. Lopez's comment constitutes far less evidence of willfulness than has been rejected in other cases. For example, in *Ikossi-Anastasiou v. Bd. of Supervisors of Louisiana State Univ.*, 579 F.3d 546 (5th Cir. 2009), a Louisiana State University professor alleged willful violations of the Equal Pay Act (a part of the FLSA) on the basis that (1) her salary records showed she was paid less than many of her male colleagues, and (2) she filed formal grievances in 1995 and 1998 expressing dissatisfaction with her salary and requesting her

1   pay be adjusted upward to match that of her male colleagues. The Fifth Circuit found this was

2   "not enough to raise a fact question as to whether LSU knew or recklessly disregarded that its

3   pay scale was prohibited by the FLSA." *Id.* at 553. In so concluding, the court stated: "[Plaintiff]

4   has not provided evidence that LSU actually knew that the pay structure violated the FLSA, or

5   that LSU ignored or failed to investigate [plaintiff's] complaints. Without more evidence,

6   [plaintiff's] allegations of willfulness cannot survive the summary judgment stage." *Id.*

7          Here, Plaintiffs have not proffered evidence that RHA intentionally violated the FLSA or

8   recklessly disregarded its provisions. Therefore, the Lopezes' FLSA wage claims are subject to a

9   two-year statute of limitations, and are time-barred.

10          **b.  FLSA Wage Claims**

11          The Court next turns to the merits of Plaintiffs' claims for unpaid wages under the FLSA.

12  Because the parties' motions assume an employment relationship between RHA and Plaintiffs,

13  the Court's analysis will be based on the same assumption.

14          The FLSA expressly permits employers to offset a portion of their federal minimum

15  wage obligation with the reasonable cost of board, lodging or other facilities customarily

16  furnished to employees. 29 U.S.C. § 203(m). Under the statute, the Secretary of Labor[4] is

17  "authorized to determine the fair value of such board, lodging, or other facilities for defined

18  classes of employees and in defined areas, based on average cost to the employer or to groups of

19  employers similarly situated, or average value to groups of employees, or other appropriate

20  measures of fair value." *Id.* To claim the benefit of the offset, the employer must meet certain

21  requirements: (1) the lodging must be regularly provided by the employer or similar employers,

22  29 C.F.R. § 531.31; (2) the employee's acceptance of the lodging must be voluntary and

23

24  _____

[4] In 29 C.F.R. § 531.1, the Secretary of Labor expressly "delegated to the Administrator the
functions vested in him under [Section 203(m)]."

uncoerced, 29 C.F.R. § 531.30; (3) the lodging must be furnished in compliance with all applicable federal, state, and local law, 29 C.F.R. § 531.31; (4) the lodging must be provided primarily for the benefit of the employee rather than the employer, 29 C.F.R. § 531.3(d)(1); and (5) the employer must maintain and preserve records substantiating the cost of furnishing the lodging, 29 C.F.R. § 516.27(a).

Here, Plaintiffs assert, for various reasons, that RHA is not entitled to claim any offset based on the lodging provided to Plaintiffs, and therefore Plaintiffs must be paid at least minimum wage for all hours worked. Plaintiffs further argue that they must be compensated not only for hours of actual work, but for all hours during which they were required to be on call. Of course, RHA counters that it is entitled to an offset of its reasonable costs in providing lodging and that Plaintiffs' on-call time is non-compensable.

### i. Whether RHA is entitled to a wage offset based on the reasonable cost of providing lodging

#### 1. RHA's failure to petition the Administrator

Plaintiffs argue first that RHA is not entitled a wage offset under Section 203(m) because RHA failed to petition the Administrator of the DOL's Wage and Hour Division ("the Administrator") for a determination of the reasonable cost of providing lodging to Plaintiffs. This failure, Plaintiffs contend, is fatal to RHA's claim of offset. RHA does not dispute that it did not petition the Administrator for a determination of reasonable cost. (Resp. 4, ECF No. 99.)

Section 203(m) reads: "'Wage' paid to any employee includes the reasonable cost, *as determined by the Administrator*, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees . . . ." (Emphasis added.) The Section also provides that the Secretary of Labor is authorized to make determinations of the "fair value" of the board, lodging,

or other facilities furnished by an employer in lieu of wages. According to the federal regulations interpreting Section 203(m), the Administrator may, "[u]pon his motion or upon the petition of any interested person, . . . determine generally or particularly the 'reasonable cost' to an employer of furnishing any employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by the employer to his employees." 29 C.F.R. § 531.4(a). However, this is not the only permissible way to determine reasonable cost under the regulations, and employers are expressly allowed to make such determinations in accordance with specific instructions provided within the same set of regulations:

> Section 3(m) directs the Administrator to determine "the reasonable cost * * * to the employer of furnishing * * * facilities" to the employee, and in addition it authorizes him to determine "the fair value" of such facilities for defined classes of employees and in defined areas, which may be used in lieu of the actual measure of the cost of such facilities in ascertaining the "wages" paid to any employee. Subpart B contains three methods whereby an employer may ascertain whether any furnished facilities are a part of "wages" within the meaning of section 3(m): (1) *An employer may calculate the "reasonable cost" of facilities in accordance with the requirements set forth in § 531.3*; (2) an employer may request that a determination of "reasonable cost" be made, including a determination having particular application; and (3) an employer may request that a determination of "fair value" of the furnished facilities be made to be used in lieu of the actual measure of the cost of the furnished facilities in assessing the "wages" paid to an employee.

29 C.F.R. § 531.33(a) (emphasis added).

Indeed, 29 C.F.R. § 531.3 explains to an employer how exactly to make the determination of reasonable cost where such employer is not already subject to a determination by the Administrator:

> Except whenever any determination made under § 531.4 is applicable, the "reasonable cost" to the employer of furnishing the employee with board, lodging, or other facilities (including housing) is the cost of operation and maintenance including adequate depreciation plus a reasonable allowance (not more than 5 1/2 percent) for interest on the depreciated amount of capital invested by the employer: Provided, That if the total so computed is more than the fair rental value (or the fair price of the commodities or facilities offered for sale), the fair rental value (or the fair price of the commodities or facilities offered for sale)

shall be the reasonable cost. The cost of operation and maintenance, the rate of depreciation, and the depreciated amount of capital invested by the employer shall be those arrived at under good accounting practices.

These provisions clearly indicate that the Administrator, in interpreting Section 203(m), did not intend to impose upon employers an obligation to petition the Administrator for a determination of reasonable cost as a prerequisite to claiming the wage offset permitted by the statute.

Regulations such as these are generally accorded substantial deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"). Here, the statute provides that the Administrator is to make determinations of the reasonable cost of furnishing employees with board, lodging, or other facilities. However, the statute does not provide guidance to the Administrator regarding how such a determination should specifically be made. In filling that gap, the Administrator permitted employers, subject to strict guidelines, to make their own determinations of reasonable cost where, as here, there has been no prior determination by the Administrator. The Court cannot conclude that these regulations are arbitrary or contrary to the statute. Further, Plaintiffs have cited no case law to support their argument that the failure to petition the Administrator for a determination of reasonable cost works as an absolute bar to a claim of offset. In fact, the relevant case law suggests the opposite conclusion. *See, e.g., Estanislau v. Manchester Developers, LLC*, 316 F. Supp. 2d 104, 107–08 (D. Conn. 2004) ("The clear implication of the two regulations is that while the Administrator may make a determination, he/she need not do so.").

Accordingly, the Court rules that RHA's failure to petition the Administrator does not prevent it from claiming the wage offset available to it under Section 203(m).

## 2. Whether Plaintiffs' lodging was "customarily furnished" (29 C.F.R. § 531.31)

Plaintiffs next argue that RHA may not take the Section 203(m) offset because their lodging was not "regularly provided" by RHA within the meaning of the 29 C.F.R. § 531.31. Plaintiffs base their argument on two facts: first, that RHA does not provide lodging to its other, non-live-in employees; and second, that no other known housing authority within the United States provides lodging to employees under a similar live-in program. (Mot. Summ. J. 14–15, ECF No. 81.)

The Court is not persuaded. Again, Plaintiffs do not cite any case law supporting their position. And neither the language of the statute nor the applicable regulations support so strict a requirement that employers must provide lodging to *all* of their employees, regardless of the disparate duties associated with different positions, in order to take any credit against wages based on the reasonable cost of such lodging. The far better reading of the statute and regulations—and the reading endorsed in the July 10, 1963 DOL Opinion Letter submitted by RHA—is that it suffices to provide such lodging, regularly and indiscriminately, to all of a particular class of employee. In its Opinion Letter, the Wage and Hour Division advised that lodging satisfies the requirement of being "customarily provided" where the employer (Northern Gas Company) provided such lodging consistently, over a period of four years, to a single employee designated as "master mechanic." (ECF No. 110-3 at 3.) In so opining, Division stated: "The fact that the employer does not customarily furnish houses to all of his employees does not warrant a contrary conclusion." The Court agrees. Here, RHA has consistently provided free lodging to all live-in tenants over the course of approximately 28 years. Under these circumstances, the Court rules as a matter of law that the lodging for which RHA claims a wage offset was "customarily provided" within the meaning of Section 203(m).

### 3. Whether Plaintiffs' acceptance of the lodging was "voluntary and uncoerced" (29 C.F.R. § 531.30)

Plaintiffs argue that their acceptance of free lodging in lieu of wages was not voluntary because they were not able to choose between lodging and wages as compensation for doing the job of a live-in, and were not able to choose whether to reside in the lodging specified by RHA. (Mot. Summ. J. 16–18, ECF No. 81.) Federal regulations require that an employee's choice to accept lodging as compensation in lieu of wages must be voluntary and uncoerced. 29 C.F.R. § 531.30.

In 1981, the D.C. Circuit had occasion to interpret the meaning of "voluntary and uncoerced" in circumstances sufficiently similar to those presented here. *Lopez v. Rodriguez*, 668 F.2d 1376, 1380 (D.C. Cir. 1981). The court first discussed two cases in which district courts had denied employer credits for board and lodging, based on the employers' failure to obtain voluntary and uncoerced agreements to the employment arrangements. *See Marshall v. Intraworld Commodities Corp.*, No. 79 C 918, 1980 WL 2097, at *4 (E.D.N.Y. June 9, 1980) ("The claimant had no other place to live and no choice but to accept the food and facilities provided to him."); *Marshall v. New Floridian Hotel, Inc.*, No. 77-1028-CIV, 1979 WL 1991, at *11 (S.D. Fla. Aug. 29, 1979) ("Defendants have failed to provide their employees with an option to receive in cash the amounts attributed and claimed as a credit by defendants for meals, lodging or other facilities."). The court then went on to state:

> The tests enunciated in *Intraworld* and *New Floridian Hotel* may have been appropriate under the factual circumstances considered by the courts in those cases. We think a somewhat different approach is necessary, however, in a case such as this one, involving a live-in domestic service employee. Where, as here, "living-in" is an integral part of the job, the elements of voluntarism and coercion take on different meanings than those suggested in *Intraworld* and *New Floridian Hotel*. Implicit in the courts' decisions in each of those cases was a finding that "living-in" was not a necessary condition of employment. However, in the present case, appellants were concededly seeking to employ a "live-in" housekeeper and babysitter when they hired appellee. If appellee understood this when she

accepted the job, and if her acceptance of the job was voluntary and uncoerced,
then it is idle to inquire whether her initial acceptance of board and lodging was
voluntary and uncoerced. Appellee had no choice but to accept the lawful "live-
in" condition if she desired the job.

*Lopez*, 668 F.2d at 1380. The court continued its analysis by finding the plaintiff-appellee did

voluntarily enter into her employment relationship, observing that she both fully understood the

arrangement and had deliberate personal reasons for accepting it. *Id.* Finally, while recognizing

that an initially voluntary employment arrangement may at some point become coercive, the

court concluded:

> In reconsidering this case, the District Court may deny a credit to appellants for
> board and lodging for part of the employment period *only if it finds that appellee*
> *would have left the job but for the coercive conditions imposed upon her by*
> *appellants*. Any finding that appellee was unable to leave the job, however, must
> be attributable to restrictive actions taken by her employers. *To hold otherwise*
> *would be to ignore the fact that "living-in" was an integral part of appellee's job.*

*Id.* at 1380–81 (emphasis added).

Further, in December 2015, the Wage and Hour Division issued guidance to its regional

administrators and district directors, instructing that the Division "will normally consider the

lodging as voluntarily accepted by the employee when living at or near the site of the work is

necessary to performing the job." (Field Assistance Bulletin No. 2015-1 at 3, ECF No. 100-2.) In

the Bulletin, the Division cited both *Lopez*, discussed above, and *Brock v. Carrion, Ltd.*, 332 F.

Supp. 2d 1320 (E.D. Cal. 2004). In *Brock*, the court based its finding of voluntariness on the fact

that the plaintiff signed the employment agreement and never actually asserted that he was

coerced into doing so. *Id.* at 1324 n.3.

Here, there is no question that "living at or near the site of the work is necessary to

performing the job" of a live-in tenant. It is undisputed that an integral function of a live-in is to

be the "eyes and ears of management" outside of regular business hours. This requires live-ins to

be on call (i.e., "on premises or close enough to respond within no more than 15 minutes") from
6:00 p.m. to 7:00 a.m. every night, and for twenty-four hours a day on weekends and holidays.
(*See* Agreement § 2, ECF No. 83-4.) Mr. Morton testified that the purposes of the live-in position
are to ensure management knows what is happening on the property after hours, to deal with
emergency situations that arise after hours, and to maintain a presence on-site that will help
tenants feel more comfortable after hours. (*See* Morton Dep. 30:8–32:2, ECF No. 85-1.) All of
these purposes are best served by a live-in tenant, especially considering that the job requires the
employee to be on call for more than sixty consecutive hours each weekend. As was the case in
*Lopez*, RHA was concededly seeking to hire "live-in" employees when it hired Plaintiffs.
Therefore, as in *Lopez*, if Plaintiffs understood the live-in requirement when they accepted the
job, and if their acceptance of the job was voluntary and uncoerced, then it is idle to inquire
whether their initial acceptance of lodging was voluntary and uncoerced.

Here, there is no evidence to suggest that Plaintiffs' acceptance of the live-in position
was involuntary or coerced. Again, all the evidence points in the other direction. All of the
Plaintiffs testified that they fully understood the Agreement prior to entering into it, and fully
deliberated whether the arrangement would be beneficial to them prior to accepting it. (*See* Resp.
10–17, ECF No. 99.) Mr. Roces actively sought after the live-in position, understood the work he
would be expected to do and how he would be compensated, and even testified regarding his
initial acceptance of the Agreement: "[I]t was my decision to sign or not." (Roces Dep. 70:10–
71:20, ECF No. 87-1.) Subsequently, being fully aware of what the live-in position entailed, Mr.
Roces renewed his one-year Agreement four times. (*Id.* at 52:2–14.) Mr. and Mrs. Lopez also
voluntarily accepted the Agreement, after initially feeling free to decline the opportunity. (Judith
Lopez Dep. 49:18–50:6, ECF No. 89-2.) RHA contacted the Lopezes when the live-in position
became available. After first turning it down, the Lopezes later proactively pursued the position

by reaching out to RHA. (*Id.*) They also renewed their Agreement five times. (*Id.* at 71:20–23.) Finally, Mr. Villa and Ms. Chavez voluntarily accepted the Agreement as well, after discussing the opportunity with one another. Both saw it as "a good opportunity" to save money, and Ms. Chavez testified: "[O]ur dream was to buy a house, have our credit score fixed." (Villa Dep. 56:15–21, ECF No. 92-1; Chavez Dep. 28:12–29:24, ECF No. 94-1.) The live-in arrangement was a chance to achieve those goals. After their first year as live-ins, Mr. Villa and Ms. Chavez continued in the position for another three years. (Villa Dep. 108:14–109:14; Chavez Dep. 55:21–57:1.)

Further, there is no indication that Plaintiffs would have resigned from the live-in position but for coercive conditions imposed upon them by RHA. *See Lopez*, 668 F.2d at 1380. To the contrary, the Lopezes, Mr. Villa, and Ms. Chavez all eventually resigned from the position of their own free will, and Mr. Roces acknowledged that he could have quit at any time, for any reason, simply by giving five days' notice. (*See* Judith Lopez Dep. 73:20–74:16 (moved out to live with daughter and help daughter pay her bills); Villa Dep. 105:8–107:9 (moved out to provide children with more space and different living experience); Roces Dep. 99:6–100:2.)

Lastly, the Court notes that the case law Plaintiffs rely upon is inapposite. In their Motion, Plaintiffs cite to *Intraworld* and *New Floridian Hotel*, the two cases discussed in *Lopez*. (Mot. Summ. J. 16–18, ECF No. 81.) However, as the court observed in *Lopez*, "[i]mplicit in the courts' decisions in each of those cases was a finding that 'living-in' was not a necessary condition of employment." 668 F.2d at 1380. In their Reply, Plaintiffs cite to *Cuevas v. Bill Tsagalis, Inc.*, 149 Ill. App. 3d 977 (1986), an Illinois state court case in which the court did not make a voluntariness determination. Rather, the court ultimately held that the employer was unable to substantiate its estimate of the reasonable cost of providing meals to its employees. *Id.* at 986.

Accordingly, the Court finds that "living in" was a necessary part of the live-in position at RHA, and that Plaintiffs have not adduced any evidence of coercion, neither in the initial signing of their Agreements, nor in their subsequent retention of the position. On this basis, the Court rules as a matter of law that Plaintiffs' acceptance of their lodging was voluntary and uncoerced.

### 4. Whether Plaintiffs' lodging complied with federal, state, and local law (29 C.F.R. § 531.31)

Next, Plaintiffs argue that their lodging did not comply with Nevada law, because "lodging in lieu of wages is illegal" in Nevada.

In the Wage and Hour Division's guidance Bulletin of December 17, 2015, several examples are given of lodging that is not eligible for a Section 203(m) wage credit by virtue of being "in violation of any Federal, State, or local law, ordinance, or prohibition." (Field Assistance Bulletin No. 2015-1 at 3–4, ECF No. 100-2.) Such examples include lodging that is substandard or not authorized for residential use, or for which necessary occupancy permits have not been obtained. These examples accord with the Court's understanding of the regulations, and also demonstrate the error in Plaintiffs' argument on this factor. The regulations require that the lodging itself comply with state law, not that lodging in general be a permissible form of compensation under state law. Of course, qualifying for a wage credit under the FLSA is not dispositive of whether any similar credit may be taken under Nevada law; that is an entirely separate question. An employer may well violate state wage-and-hour laws while fully complying with the FLSA.

Here, Plaintiffs have not alleged that the lodging they were provided was itself deficient or unlawful in any way. Furthermore, they have not cited any case law to support the argument that their lodging would be "in violation of state law" under the FLSA simply because state law

does not permit the same in-kind compensation permitted by the FLSA. And the case law the Court has found strongly suggests that the purpose of 29 C.F.R. § 531.31 is merely to ensure that the lodging provided in lieu of wages meets minimum standards for safe, healthful, and lawful housing conditions pursuant to all applicable laws and ordinances. *See, e.g., Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 291 n.4 (4th Cir. 2018) (remanding case for district court to determine whether employer violated county code by failing to obtain a permit to use a cellar for sleeping); *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 710–12 (E.D.N.C. 2009) (employer failed to have migrant housing inspected prior to occupancy, in violation of state law); *Archie v. Grand Cent. P'ship, Inc.*, 86 F. Supp. 2d 262, 270 (S.D.N.Y. 2000) (lodging without beds did not meet state requirements for overnight lodging for the homeless); *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 638–40 (W.D. Tex. 1999) (employer took unauthorized deductions for housing where the lodging provided was "substandard").

Therefore, Plaintiffs have failed to make any relevant allegation with respect to the illegality of their lodging, within the meaning of 29 C.F.R. § 531.31.

### 5. Whether Plaintiffs' lodging was provided primarily for their benefit (29 C.F.R. § 531.3(d)(1))

Plaintiffs argue that RHA is not entitled to a wage credit for lodging because the lodging was not provided primarily for their benefit, but for the benefit of RHA. The parties agree with the Wage and Hour Division on the principle that "[l]odging is ordinarily presumed to be for the primary benefit and convenience of the employee." (*See* Field Assistance Bulletin No. 2015-1 at 4, ECF No. 100-2.) However, the presumption may be rebutted "by substantial evidence demonstrating that the housing is not a benefit running primarily to the employee, but rather a burden imposed upon the employee in furtherance of the employer's business." *Soler v. G. & U., Inc.*, 833 F.2d 1104, 1110 (2d Cir. 1987). "Whether in a particular case the presumption has been

rebutted is determined by balancing the relative benefits to an employer and employee." *Id.*
Various courts have recognized that "[s]pecial circumstances may exist where lodging is of little
benefit to an employee" and have held that a lodging credit may not be taken in situations similar
to the one presented here, "such as when an employer requires an employee to live on-site to
meet a particular need of the employer, or when an employee is required to be 'on call' at the
employer's behest." *Id.*; *see also, e.g., Bailey v. Pilots' Ass'n for Bay & River Delaware*, 406 F.
Supp. 1302, 1309 (E.D. Pa. 1976) (sleeping facilities aboard pilot boat and in a shore-side station
were primarily for the benefit of pilot's employer because pilot was required to be on duty for
seven days at a time); *Jiao v. Shi Ya Chen*, No. 03-cv-165 (DF), 2007 WL 4944767, at *14
(S.D.N.Y. Mar. 30, 2007) (Freeman, M.J.); *Schneider v. Landvest Corp.*, No. 03-cv-2474, 2006
WL 322590, at *28 (D. Colo. Feb. 9, 2006) (Daniel, J.); *Marshall v. Debord*, No. 77-106-C,
1978 WL 1705, at *6 (July 27, 1978) (Morris, J.).

      There is no dispute here that RHA required Plaintiffs to live on-site and to be on call to
respond to emergencies during a significant number of hours every day. Thus, their situation
would seem to fall into the same category as others where the wage offset for housing costs has
been disallowed. For example, the plaintiffs in *Schneider* were employed as resident managers of
a storage facility in Aurora, Colorado. They agreed, as a condition of their employment, to
inhabit an apartment at the facility they managed. *Schneider*, 2006 WL 322590, at *28. With
minimal analysis, the court held the provision of housing primarily benefitted the employer
because the plaintiffs were required to live at the facility, their presence "added an appearance of
added security," and the arrangement "allowed both plaintiffs and [the employer] more
flexibility in maintaining the facility and allowed plaintiffs time off for slow periods." *Id.*

      Here, however, Plaintiffs have not submitted sufficient evidence to rebut the presumption
that the free housing provided by RHA was not primarily for their benefit. In this case, it cannot

be said that Plaintiffs' free housing was a burden imposed upon them in furtherance of RHA's business. *See Soler*, 833 F.2d at 1110. The requirement that Plaintiffs reside on RHA premises was not an incidental condition of their desired employment. On the contrary, free housing was the main attraction in accepting to do the related work. In other words, Plaintiffs did not accept the condition of on-site housing in order to be able to do a job at RHA; they accepted to do a job in order to obtain the substantial benefit of free housing. Indeed, Plaintiffs' own deposition testimony reveals that they knew their only remuneration for doing the work of a live-in would be free rent, and as discussed above, they voluntarily accepted this arrangement. In fact, four of the five Plaintiffs were already residing at their respective RHA apartment complexes, and paying rent, prior to becoming live-ins. Therefore, the apartments they inhabited as live-ins were at least in the same location and of a similar quality and kind as their prior apartments, which they chose for themselves and for which they paid monthly rent.

Furthermore, this case is distinguishable from others where courts have determined employees did not primarily benefit from free lodging. In *Bailey*, an employee was provided temporary sleeping quarters on a boat and in a shore-side station during seven-day periods of duty. 406 F. Supp. at 1309. Similarly, in *Jiao*, a hotel employee, who claimed to have been required to remain at the hotel at all times other than Thursday afternoons, was sometimes provided a hotel room to sleep in (when occupancy permitted) and sometimes required to sleep on a sofa in the lobby. 2007 WL 4944767, at *4. In *Marshall*, plaintiff rest home employees were given a room at a convalescent center where they worked, although one of them had to remain on premises at all times unless they arranged for a substitute to cover for them. 1978 WL 1705, at *2. They occupied a one room apartment with one bathroom and no kitchen. *Id.*

In contrast to these uncomfortable and inconvenient accommodations, Plaintiffs received fully functional, private apartments designed and maintained for normal residential use. Again,

both the Lopezes and Villa-Chavez were already paying to rent similar apartments in the very same complexes at the time they entered into their first Live-In Agreements. Plaintiffs were free to use and enjoy their apartments to the same extent as any other paying tenant. They were also free to come and go at all hours of the day. During business hours, from 7 a.m. to 6 p.m., Monday through Friday, Plaintiffs had no obligation to remain at or near their apartments and had significant liberty in deciding at what time of day to complete their daily grounds inspection. This level of freedom even afforded them the possibility of maintaining other employment while serving as a live-in. (*See* Roces Dep. 40:8–22, 220:11–21 (employed full-time at Northern Nevada Veterans Resource Center from October 2012 to August 2014); Villa Dep. 30:6–35:12 (maintained full-time employment elsewhere during "most of the time" he was a live-in at RHA); Chavez Dep. 119:22–121:13 (began part-time employment with the Washoe County School District while still a live-in at RHA)). Even during their "on-call" hours, Plaintiffs were free to leave the premises, as long as they remained close enough to respond to emergency calls within fifteen minutes. This allowed them to engage in all manner of activities, including coaching in a youth soccer league, playing in an adult soccer league, going out to dinner, attending regular church services, going to the movies, visiting with friends, doing the shopping, and so on. (Villa Dep. 16:19–21:12, 137:12–138:8; Chavez Dep. 123:8–125:6; Judith Lopez Dep. 94:13–20; Juan Lopez Dep. 147:25–148:20, ECF No. 91-1; Roces Dep. 189:15–190:6; Roces Dep. Vol. II 49:9–50:21, ECF No. 88-2.)

In addition, interruptions during on-call hours, the record indicates, were infrequent. Mr. Roces testified that he received two to four emergency calls per month, and that it took an average of thirty minutes to an hour to resolve each call. (Roces Dep. 153:15–18, 156:5–157:4, ECF No. 87-1.) Mr. Roces's "pocket work orders," as well as the call logs of the Answer West answering service, show that he received an average of one call every 10.87 days. (Rosen

Report, ECF No. 95-6 at 21–23.) Giving full credit to his deposition testimony, Mr. Roces spent about one hour of on-call time per week responding to emergency calls. The Lopezes received, on average, one call every 4.8 days. (Rosen Report, ECF No. 95-5 at 3.) For each call, the Lopezes completed a work order and recorded the amount of time spent to respond. (*See* Juan Lopez Dep. 53:20–24, ECF No. 91-1.) According to these records, each call took between twenty-five and thirty minutes. (Rosen Report, ECF No. 95-5 at 4.) Lastly, Mr. Villa claims he and Ms. Chavez received between ten and twenty calls each month, while Ms. Chavez testified that she remembers receiving approximately twelve calls per month. (Villa Dep. 121:6–19; Chavez Dep. 116:8–14.) In contrast, the Answer West call logs indicate that Mr. Villa and Ms. Chavez actually received an average of one call every 12.7 days. (*See* Rosen Report, ECF No. 95-6 at 54–60.) Giving full credit to Mr. Chavez's deposition testimony, he responded to less than one emergency call per day and spent a total of up to two hours per day performing all his contractual duties under the Live-In Agreement. (Villa Dep. 272:8–273:13, ECF No. 92-2 (one to two hours per day to complete all the duties required by paragraphs 2A through 2C of Agreement).)

In sum, the evidence does not support a finding that Plaintiffs' free housing was "of little benefit" to them. *See Soler*, 833 F.2d at 1109. Plaintiffs were provided private residential apartments which they were generally free to enjoy to the same extent as any paying tenant. As the undisputed evidence demonstrates, the significant majority of their time was available to them to use and enjoy their homes as they saw fit. Plaintiffs have voiced no real complaint about the nature, quality, location, convenience, or cleanliness of their accommodations, except that Mr. Roces perhaps thought his three-bedroom apartment was too large (although it permitted him to have family members live with him), and Mr. Villa and Ms. Chavez perhaps thought theirs

1    was too small (although becoming live-ins allowed them to relocate from a two-bedroom unit to

2    a three-bedroom).

3         Of course, RHA also benefitted from Plaintiffs' presence on the work premises; the very

4    nature of the job required Plaintiffs to be at or relatively close to RHA property during all on-call

5    hours. However, this case is very different from the cases discussed above, where living in

6    employer-provided lodging imposed substantial detriments on the employee. Here, the

7    detriments associated with Plaintiffs' free housing are minor, while the advantages are great.

8    Plaintiffs benefitted from the free housing arrangement at least as much as RHA, if not more so.

9    Therefore, Plaintiffs have not produced substantial evidence to rebut the presumption that the

10   lodging provided to Plaintiffs was primarily for their benefit.

11        Accordingly, the Court finds as a matter of law that the rent-free lodging provided by

12   RHA was primarily for the benefit and convenience of Plaintiffs.

13                    **6. Whether RHA has maintained adequate records
                         substantiating the cost of furnishing the lodging (29
14                       C.F.R. § 516.27(a))**

15        Plaintiffs argue next that RHA is not entitled to a credit for rent-free lodging because

16   RHA failed to "maintain and preserve records substantiating the cost of furnishing" such lodging

17   as required by 29 C.F.R. §§ 516.27(a) and (b). Specifically, Plaintiffs claim that RHA was

18   required to "maintain records showing on a workweek basis" any deductions from wages. RHA

19   concedes it did not maintain weekly payroll records for Plaintiffs (as it did not view Plaintiffs as

20   employees), but that its failure to do so is not an absolute bar to receiving a lodging credit against

21   Plaintiffs' wages.

22        Several courts have analyzed the recordkeeping requirements under 29 C.F.R. § 516.27,

23   and have ultimately disallowed the lodging credit based, in part, on an employer's failure to

24   maintain adequate records. For example, in a case relied upon by Plaintiffs, the Eighth Circuit

denied the lodging credit where an employer "did not keep the required records and offered no evidence except its own statement as to what the company considered the worth of the [lodging] to be." *Donovan v. Williams Chemical Co.*, 682 F.2d 185, 189 (8th Cir. 1982). In addition, the employer "did not attempt to substantiate the valuation by explaining how the value was reached or indicate whether or not it included profit." *Id.* However, notwithstanding the employer's apparent failure to maintain records, the court remanded the case and instructed that the district court "may consider additional evidence as to the reasonable value of the lodgings." *Id.* at 190.

Plaintiffs also cite *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500 (11th Cir. 1993), which reached substantially the same conclusion as *Williams Chemical*: "An employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the recordkeeping provisions of the FLSA, and where there has been no determination of reasonable cost by the Wage and Hour Division does not satisfy the employer's burden of proving reasonable cost." *Id.* at 1514 (citations omitted). In *Caro-Galvan*, the Eleventh Circuit rejected an employer's lodging credit claim because the "only evidence of reasonableness was the bare, conclusory testimony of [the employer's president and owner]." *Id.* The circuit court concluded: "On remand, [the employer] will have the opportunity to introduce records showing that its deductions were reasonable." *Id.*

The last published opinion cited by Plaintiffs, *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320 (E.D. Cal. 2004), is also in accord. In *Brock*, the employer admitted it had no documentation in its possession demonstrating the actual cost of providing plaintiff with lodging. *Id.* at 1326. As substitute evidence, the employer attempted first to rely on the fair market value of the apartment provided ($1,095 per month), and then on the fact that the parties stipulated to a "rent" amount ($550 per month) in the employment contract. *Id.* at 1327. In addressing these two potential bases for determining reasonable cost, the court stated:

The first undoubtedly includes profit to the defendants (as prohibited by 29 C.F.R. § 531.3), and defendants have made no attempt to segregate such profits from the actual cost of furnishing such lodging (as required by federal case law). [*Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1370 (5th Cir. 1973)]. The second is, at best, merely an "unsubstantiated estimate" of defendants' costs, in the absence of physical records indicating otherwise. [*Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 475 (11th Cir. 1982)].

*Id.*

Notably, Plaintiffs have not cited any published case in which a lodging credit was denied for the sole reason of an employer's failure to maintain the records required by 29 C.F.R. § 516.27. In *Williams Chemical*, *Caro-Galvan*, and *Brock*, the lodging credit was not rejected simply because the employers failed to keep records, but because they failed to keep records *and* failed to present other credible evidence substantiating their estimates of reasonable cost. As observed by the Southern District of New York in a case analogous to Plaintiffs': "The matter is one of sufficient evidence." *Archie v. Grand Cent. P'ship, Inc.*, 86 F. Supp. 2d 262, 266 (S.D.N.Y. 2000). In fact, the court in *Archie* stated the relevant principle succinctly:

[T]hat defendants did not maintain records showing deductions from wages on a workweek basis, as required under 29 C.F.R. § 516.27(b) for employers who provide benefits as wages, does not mandate denial of deductions now. *Of course defendants did not keep such records, as they did not view plaintiffs in the status of employees* until Judge Sotomayor held them to have been so. Moreover, plaintiffs offer no authority that the failure to have kept records by itself mandates denial of deductions. Plaintiffs rely on *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir.1982), where the court rejected the defendants' effort to deduct the cost of meals and lodging when the defendants had not kept the records required by the regulations. However, the court in that case did not rest its decision on the absence of the required records, *but rather on the fact that the defendants had not put forward evidence that supported their claims as to the costs to them of the room and board.*

*Id.* (emphasis added).

Here, RHA did not maintain weekly records of hours worked, wages earned, or deductions from wages based on the reasonable cost of the housing provided. Like the employer in *Archie*, RHA did not view Plaintiffs as employees. However, RHA offers much more than

"unsubstantiated estimates" as evidence of its reasonable costs. In preparing its case, RHA employed a certified public accountant to review, *inter alia*, RHA's audited financial statements, asset listing and depreciation schedules for all RHA public housing facilities, U.S. Department of Housing and Urban Development financial data schedules pertaining to RHA, cost of equity capital information obtained from Ibbotson and Morningstar, and Federal Reserve statistical releases, in order to determine the reasonable cost of providing Plaintiffs' housing in accordance with the guidelines set forth in 29 C.F.R. § 531.3. (*See* Otis Report 13–15, ECF No. 83-14.) Plaintiffs have not challenged the substance or conclusions of the expert reports submitted by RHA ("the Otis Reports"), but have relied solely on RHA's failure to maintain certain contemporaneous employment records to argue that the housing credit must be denied. What the Otis Reports reveal, however, is that RHA did maintain and preserve sufficient records to "substantiate the cost of furnishing" lodging to Plaintiffs. Thus, RHA has apparently complied with 29 C.F.R. § 516.27(a), if not subparagraph (b). In any case, RHA has satisfied its burden of presenting sufficient evidence to substantiate the reasonable cost of providing housing to Plaintiffs.

At summary judgment, when a moving party satisfies its initial evidentiary burden, the burden then shifts to the nonmovant to present evidence establishing a genuine issue of material fact. With respect to the reasonable cost of providing Plaintiffs' housing, RHA has presented expert reports and affidavits setting forth concrete cost estimates for the apartments at issue in this case. Plaintiffs have not attempted to mount a factual challenge to the Otis Reports. Therefore, the Court must accept the facts set forth in the Otis Reports as undisputed.

### ii. Whether Plaintiffs' "on-call time" is compensable under the FLSA

The central feature of this case is Plaintiffs' claim that they are entitled to hourly compensation for all hours during which they were required to be on call, which total 113 hours

per week. "The Supreme Court has held that time spent waiting for work is compensable if the waiting time is spent 'primarily for the benefit of the employer and his business.'" *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992), *as amended* (Aug. 18, 1992) (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944)). Determining whether on-call time is compensable is ultimately a legal question, but one that depends upon all the circumstances of the case. *See id.* In making this determination, courts in the Ninth Circuit rely on two predominant factors: "(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties." *Berry v. Cty. of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994) (quoting *Owens*, 971 F.2d at 350).

### 1. Freedom to engage in personal activities

"The regulations at 29 C.F.R. §§ 785.14–17, which clarify the 'waiting to be engaged' doctrine, clearly state that an employee is only compensable for idle time when 'the employee is unable to use the time effectively for his own purposes.'" *Owens*, 971 F.2d at 350; *see also* 29 C.F.R. § 785.15 (one aspect of being "on duty" is the inability to use time effectively for one's own purposes); 29 C.F.R. § 785.17 (on-call time is compensable when an employee cannot use her time effectively for her own purposes). In *Owens*, the Ninth Circuit provided an "illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal activities while on-call." *Berry*, 30 F.3d at 1183. The list included:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* The Ninth Circuit has also instructed that "no one factor is dispositive," and that courts should "balance the factors permitting personal pursuits against the factors restricting personal

pursuits to determine whether the employee is so restricted that he is effectively engaged to wait." *Id.*

Here, the most persuasive factor is the great infrequency of the calls to work. According to the Answer West call logs and the work orders completed by Plaintiffs, the average call frequency ranged from one call every 4.8 days (in the case of Mr. and Mrs. Lopez) to one call every 12.7 days (in the case of Mr. Villa and Ms. Chavez). Even the Plaintiffs' highest call frequency estimate, given by Mr. Villa, was ten to twenty calls per month, or roughly one call every other day. Because Plaintiffs are the nonmovants on this issue, the Court must view the evidence in the light most favorable to them; therefore, the Court will accept Mr. Villa's estimate for purposes of summary judgment. But even the estimate of ten to twenty calls per month pales in comparison to the call frequencies at issue in cases where on-call time was found to be compensable. *See, e.g., Renfro v. City of Emporia*, 948 F.2d 1529 (10th Cir., 1991) (4–5 calls per 24-hour period); *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1131 (10th Cir. 2000) (3–5 calls per night); *see also Berry*, 30 F.3d at 1186 (on-call time *not* compensable where employee received one call every 6.45 hours); *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 674 (5th Cir. 1991) (on-call time *not* compensable where employee received about 5 calls per week).

Beyond the sheer infrequency of calls, the evidence also demonstrates that the average work time required by the calls was minimal. Mr. Roces testified that it took thirty minutes to one hour to resolve each call, and that he received two to four calls per month. (Roces Dep. 156:5–8, 157:2–4, ECF No. 87-1.) Therefore, giving him credit for his highest estimates, during his 113 on-call hours each week, he performed a mere hour of actual work in responding to calls. The results are similar for the other Plaintiffs. Mr. and Mrs. Lopez received one call every 4.8 days, and logged their work time for each call, which averages out to 0.44 hours per call. (Rosen

Report, ECF No. 95-5 at 3–6.) Therefore, the average time spent by the Lopezes in responding to calls each week accounts for roughly forty minutes of their 113 hours of on-call time. Lastly, Mr. Villa estimated that he and Ms. Chavez received ten to twenty calls per month, and testified that in a "typical situation" it took twenty to thirty minutes to respond to an emergency call and fill out all related paperwork.[5] (Villa Dep. 121:6–14, 225:25–228:22, ECF No. 92-1.) Accepting Mr. Villa's high-end estimates of twenty calls per month and thirty minutes per call, he was engaged in work during approximately two hours and twenty minutes of his weekly on-call time.

Also persuasive is the undisputed evidence showing that Plaintiffs actually engaged in substantial personal activities while on call. As discussed above, Plaintiffs were able to coach a youth soccer league team, play in an adult soccer league, socialize with family and friends, prepare and eat meals, dine out, shop, attend regular church services, go to the movies, read, watch television, sleep, write poetry, work in the yard, pursue hobbies, and so on, all during their on-call hours. This level of personal activity is similar to other cases where on-call time was held to be non-compensable. *See Bright*, 934 F.2d at 676 (employee able to carry on personal activities at home, shop and dine out); *Halferty v. Pulse Drug Co., Inc.*, 864 F.2d 1185, 1189 (5th Cir.1989) (employee able to visit friends, entertain guests, sleep, watch television, do laundry and babysit); *Norton v. Worthen Van Serv., Inc.*, 839 F.2d 653, 655 (10th Cir. 1988) (employees able to spend time at friends' homes, church, laundromats, restaurants, pool halls, and local gymnasium, and to pursue hobbies). Thus, it is clear from the record that Plaintiffs did actually engage in personal activities, thereby effectively using on-call time for their own purposes.

///

---

5  Plaintiffs' own evidence is contradictory on this point. Ms. Chavez testified that she remembers receiving about twelve calls per month, or three per week. (Chavez Dep. 116:12–14, ECF No. 94-1.) In contrast, the Answer West call logs indicate an average of one call every 12.7 days. (Rosen Report, ECF No. 95-6 at 54–58.)

Of course, it is true that Plaintiffs were required to live on RHA premises. Thus, the first of the so-called *Owens* factors tends to fall in Plaintiffs' favor. However, in contrast to *Armour & Co. v. Wantock*, 323 U.S. 126 (1944)—which is the case cited by the *Owens* court in including an on-premises living requirement as a relevant factor—it is also not actually in dispute that Plaintiffs were free to leave RHA premises during on-call hours.[6] The very terms of the Agreement expressly permit it. (Agreement ¶ 2D, ECF No. 83-4.) Accordingly, the more useful factors in this case are those relating to applicable geographic limitations and call response times. As the Ninth Circuit noted in *Berry*: "As a practical matter, if an employee is not required to remain on the employer's premises, geographical restrictions are imposed according to the required response time for an employee to return to the employer's premises." 30 F.3d at 1185.

Here, the Agreement required Plaintiffs to be close enough to RHA premises to respond within ten to fifteen minutes when called. In general, in cases where calls to work are not too frequent, required response times of fifteen to twenty minutes have been held not to be unduly restrictive. *See, e.g., Armitage v. City of Emporia, Kan.*, 982 F.2d 430, 432 (10th Cir. 1992) (twenty minutes); *Bright*, 934 F.2d at 676 ("approximately twenty minutes"); *Norton*, 839 F.2d at 654 (fifteen to twenty minutes). However, the restrictiveness of a ten-minute response time, as required by the earlier version of the Agreement, is a closer question. The Wage and Hour Division, as evidenced in a September 1988 Opinion Letter, has endorsed response times as short as seven minutes, provided that employees are not called back to work on a "frequent basis." (*See* Cutler Report 9–10, ECF No. 83-10.) However, the Opinion Letter also noted that these employees were firefighters in a small, rural community, "easily traversed within the 7-minute

---

6 That Plaintiffs were free to leave RHA premises also reduces the precedential value of *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931 (9th Cir. 2004), cited by Plaintiffs in response, wherein employees were required to remain within earshot of their home phones.

1   response time." Also, RHA has not cited any case in which a response time of less than fifteen

2   minutes was held not to be unduly restrictive under the *Owens* factors.

3           Certainly, a ten-minute response time may very well be too short to support a finding that

4   employees were waiting to be engaged. However, two main considerations persuade the Court to

5   conclude that the response times required by the Agreement were sufficient here. First, under

6   *Owens*, the Court is not to ask simply how many minutes an employee had to respond to a call.

7   The inquiry is whether, under the particular circumstances of the case, any fixed time limit for

8   response was *unduly restrictive. Owens*, 971 F.2d at 351. Here, the uncontroverted evidence

9   shows that Plaintiffs were, in fact, not unduly restricted from engaging in all manner of personal

10  activities during their on-call hours. Second, the Ninth Circuit requires that no one factor be

11  viewed in isolation, but that all factors be balanced "to determine whether the employee is so

12  restricted that he is effectively engaged to wait." *Berry*, 30 F.3d at 1183. Thus, the ten-minute

13  response time was not unduly restrictive in light of the facts that Plaintiffs' on-call time was

14  interrupted by calls to work very infrequently, the calls to work consumed a very minimal

15  amount of their on-call time, and Plaintiffs were able to, and did, use their on-call time

16  effectively for their own purposes. After all, that is the dispositive question: An employee's idle

17  time is compensable only when "the employee is unable to use the time effectively for his own

18  purposes." *Owens*, 971 F.2d at 350.

19          Therefore, the Court concludes that Plaintiffs were not so restricted during their on-call

20  hours as to be effectively engaged to wait by RHA.

21                          **2. The agreement between the parties**

22          "Another important factor in determining if the on-call time was spent predominantly for

23  the benefit of the employer is whether the policy was based on an agreement between the

24  parties." *Owens*, 971 F.2d at 354. Under this prong of the compensability analysis, the

Agreement stands firmly in RHA's favor. The Agreement plainly spells out the precise hours during which live-ins are expected to be on call, and makes it clear that live-ins will be required to respond to all calls received during those hours. In addition, the Agreement states that the only compensation paid to live-ins for their service, including all on-call hours, will be free rent. As analyzed above, Plaintiffs fully understood the Agreement prior to entering into it for the first time. Subsequently, all Plaintiffs, after actually doing the job and seeing what it entails, voluntarily renewed their Agreements over the course of several years. *See Owens*, 971 F.2d at 354–55 ("Similarly, the Plaintiff mechanics in the present case may not have liked the company's formal call-in system, but by continuing to work, they constructively accepted the new terms.").

Accordingly, based on all the foregoing, the Court rules as a matter of law that Plaintiffs were "waiting to be engaged" during their on-call hours, and are only entitled to compensation for time spent actually performing work.

### iii. Whether the evidence supports a claim for unpaid wages

Having concluded (1) that RHA may take a credit against Plaintiffs' wages for its reasonable cost of providing lodging, (2) that Plaintiffs have failed to challenge RHA's evidence of reasonable cost, and (3) that Plaintiffs are not entitled to compensation for time during which they were on call but not called upon, the remaining question is whether the reasonable cost of providing Plaintiffs' lodging was sufficient to compensate them for all hours of actual work, at a rate no less than the federal minimum wage.

On this issue, it is undisputed that RHA did not keep records of the hours worked by Plaintiffs. *See* 29 C.F.R. § 516.2(a)(7). When bringing a claim under the FLSA, an employee has "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). However, when an employer

has failed to maintain accurate payroll records as required by federal law, "an employee carries his burden under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work as a matter of just and reasonable inference." *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (citation omitted). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens Pottery*, 328 U.S. at 687–88.

Here, Plaintiffs' evidence of their work hours is found only in their deposition testimony. While Plaintiffs did not keep records of the hours they worked, they provided estimates related to each of the various tasks they completed. In rebuttal, RHA offers the expert opinions of William Cutler, a former employee of the Wage and Hour Division, who has calculated the Plaintiffs' work time based on various sources, including Plaintiffs' depositions, Plaintiffs' completed work orders, interviews with two other non-party RHA live-ins, and interviews with two members of RHA management. Mr. Cutler's estimates for the time it took Plaintiffs to complete their work diverge somewhat from Plaintiffs' deposition testimony. For example, Mr. Lopez estimated it took him from one to one-and-a-half hours to complete a grounds inspection as required by the Agreement. (Juan Lopez Dep. 66:18–67:9, 105:5–106:6.) However, rather than credit Mr. Lopez's testimony and adopt an average inspection time of 1.25 hours, Mr. Cutler also factors in estimates from non-party live-in John Fuji (he estimated it takes ten hours per week to complete fourteen inspections of the same properties inspected by Mr. Lopez), RHA Asset Manager Walter Dixon (who estimated it should take fifty minutes to do one inspection), and RHA Director of Asset Management Sally Rosen (who estimated it should take thirty to sixty minutes to do one inspection). As a composite of all four estimates, Mr. Cutler applied an average time of 1.01 hours for each inspection Mr. Lopez did.

In wage-and-hour cases, the number of hours actually worked by an employee is a question of fact best left to a jury. *See Mt. Clemens Pottery*, 328 U.S. at 693 ("[I]t is the duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employees' evidence as to the amount of time spent in these activities . . . ."). And while the Court does not believe that Mr. Cutler's methodology is generally unsound, neither the methodology nor the ultimate estimates proposed by Mr. Cutler show Plaintiffs' estimates of their own work time to be clearly unreasonable. Accordingly, at the summary judgment stage, without the benefit of a factfinder, the best approach the Court can take is to give full credit to Plaintiffs' estimates of their actual hours worked. If any Plaintiff's average hourly wage—based on the reasonable cost of lodging divided by the number of work hours—falls above the federal minimum wage of $7.25 after accounting for all estimated work time, the Court will grant summary judgment for RHA.

### 1. Mr. Roces

The answers provided by Mr. Roces during his deposition regarding the hours he spent on various tasks are inconsistent to say the least. However, at summary judgment, the evidence must be taken in the light most favorable to the nonmoving party. Therefore, the Court will base its calculations on the average times provided by Mr. Roces taking all of his testimony into account.

The Court's calculations are as follows:

- One grounds inspection per day (Roces Dep. 91:11–14, ECF No. 87-1), at 2.25 hours per inspection (*Id.* at 118:12–119:18, 141:24–142:6), equals **15.75 hours per week** (*see also* Roces Dep. Vol. II 22:19–23:2, ECF No. 88-2 (testifying that it could take "an hour to two hours a day to do multiple inspections, to answer emergency calls, take appropriate action"))

- Four emergency calls per month (Roces Dep. 191:7–11, ECF No. 87-1), at 1.25 hours per call (*Id.* at 157:2–4, 163:3–24), equals **five hours per month**

- **3.75 hours per week** in meetings with Tsige Haile (*Id.* at 144:5–25.)

- **Fifteen hours per year** to shovel snow (*Id.* at 181:8–22)

- **One hour per month** to address miscellaneous issues brought to his attention by David Morton (*Id.* at 147:23–149:1)

- **3.75 hours per year** to review surveillance footage (*Id.* at 114:20–115:2)

- **Fifteen minutes per week** to review RHA parking policy (*Id.* at 115:12–24)

- **Twenty minutes per year** to provide computer technical support (*Id.* at 113:19–114:18)

Adding these totals together, the Court reaches an estimated average of 21.5 hours per week, or 93.17 hours per month. This average does not account for the fact that the Agreement allows for holidays, sick days, and two weeks of vacation each year; rather, it assumes Mr. Roces worked every day. Also, the calculation does not include any work Mr. Roces claims to have done for the resident council, because his own deposition testimony establishes he was not required to do this work under his Agreement, and voluntarily took on these extra responsibilities as a "favor" to RHA. (*Id.* at 211:14–212:14.) Mr. Roces's deposition also makes mention of monthly resident council meetings and quarterly meetings for live-ins, but Plaintiffs have not pointed to any evidence regarding the length of the meetings Mr. Roces attended, and the Court cannot find any such evidence in his testimony.

During his time as a live-in, Mr. Roces inhabited an apartment at the Essex Manor complex. According to the Otis Report, the average reasonable cost per unit at Essex Manor for the two years preceding the filing of Mr. Roces's complaint, was $873.58 per month. (Otis Report 13, ECF No. 83-14 at 16.) Based on this valuation, Mr. Roces's average hourly wage during his time as a live-in is estimated to be approximately $9.38 ($873.58 / 93.17 hours = $9.38), well in excess of the federally-required minimum wage of $7.25 per hour.

Therefore, Mr. Roces has failed to present evidence sufficient to survive summary judgment, and his wage claims under the FLSA must be dismissed.

## 2. Mr. and Mrs. Lopez

The Court's calculations for Mr. and Mrs. Lopez are as follows:

- Two grounds inspections per day on weekdays, and three per day on Saturdays and Sundays (Judith Lopez Dep. 196:5–12, ECF No. 90-1), at 1.25 hours per inspection (Juan Lopez Dep. 66:18–67:9, 105:5–106:6, ECF No. 91-1; Judith Lopez Dep. 106:9–16, ECF No. 90-1; Judith Lopez Dep. Vol. II 283:18–21, ECF No. 90-2), equals **20 hours per week**

- **One hour per day** to complete inspection logs (Judith Lopez Dep. 197:14–19, ECF No. 90-1)

- One emergency call every 4.8 days, at 0.44 hours per call (Rosen Report, ECF No. 95-5 at 3–6.), equals **33.5 hours per year**

- **Forty-five minutes per week** filling out incident reports (*Id.* at 197:20–198:5)

- **Six hours per week** for council meetings (*Id.* at 204:17–205:4)

- One to two live-in meetings per year (*Id.* at 204:13–16), at 2.5 hours per meeting (Juan Lopez Dep. 73:24–74:10, ECF No. 91-1), equals **3.75 hours per year**

Adding these totals together, the Court reaches an estimated average of 34.5 hours per week, or 149.44 hours per month. This estimate also assumes that Mr. and Mrs. Lopez worked every day without holidays, sick days, or vacation time. Alternatively, if the Court assumed that the Lopezes took all their days off as permitted by the Agreement, this would reduce their yearly days of work by twenty-six days. Under this calculation, their average hours would be reduced to 32 per week.

During their time as live-ins, Mr. and Mrs. Lopez inhabited an apartment at the Silverada Manor complex. According to the Otis Report, the average reasonable cost per unit at Silverada Manor for the two years preceding their resignation, was $622.75 per month. (Otis Report 13, ECF No. 83-14 at 16.) Based on this valuation, the Lopezes' average hourly wage during their time as live-ins is estimated to be approximately $4.17 ($622.75 / 149.44 hours = $4.17), well below of the federally-required minimum wage of $7.25 per hour. Even after factoring in the

possibility that Mr. and Mrs. Lopez took twenty-six days off each year, their average hourly wage would still only be $4.49.

Accordingly, the Court cannot grant summary judgment against Mr. and Mrs. Lopez on the basis of the record evidence pertaining to their work hours. Summary judgment must therefore be granted solely on the basis of their failure to comply with the statute of limitations applicable to non-willful violations of the FLSA, as discussed *supra*.

### 3. Mr. Villa and Ms. Chavez

The Court's calculations for Mr. Villa and Ms. Chavez are as follows:

- One grounds inspection per day, at forty minutes per inspection (Villa Dep. 117:16–118:14, ECF No. 92-1), equals **four hours and forty minutes per week**

- **Forty-five minutes per day** to complete all paperwork (Chavez Dep. 115:4–6, ECF No. 94-1)

- Twenty emergency calls per month, at thirty minutes per call (Villa Dep. 121:6–14, 225:25–228:22, ECF No. 92-1), **equals 120 hours per year**

- **Fifteen minutes per week** on the phone with Answer West (Chavez Dep. 116:8–14, ECF No. 94-1)

- **Twenty minutes per week** on the phone with RHA management (Chavez Dep. 111:11–16, 133:17–24, ECF No. 94-1)

- **Forty-five minutes per week** distributing parking violation slips (Villa Dep. 266:11–269:7, ECF No. 92-2)

- **One hour per month** for resident council meetings (Villa Dep. 76:16–18, ECF No. 92-1; Chavez Dep. 113:25–114:13, ECF No. 94-1)

- **Ten hours per year** to shovel snow (Villa Dep. 128:6–129:7, ECF No. 92-1)

- One to two meetings with management per week, at one hour per meeting (Villa Dep. 140:2–141:7, ECF No. 92-1; Chavez Dep. 115:7–12, ECF No. 94-1), equals **78 hours per year**

- One to two live-in meetings per year, at one hour per meeting (Villa Dep. 141:21–142:12, ECF No. 92-1), equals **1.5 hours per year**

Adding these totals together, the Court reaches an estimated average of 15.5 hours per week, or 67.3 hours per month. This average assumes Mr. Villa and Ms. Chavez worked every day of the year. Also, this calculation likely double counts certain time spent completing paperwork, as Ms. Chavez testified that all paperwork takes her forty-five minutes to complete each day, but several of Mr. Villa's estimates already accounted separately for this paperwork time. The Court notes that it is crediting Plaintiffs' high-end estimates in this calculation, despite some inconsistent deposition testimony. (*See, e.g.*, Villa Dep. 272:8–273:13, ECF No. 92-2 (one to two hours per day to complete all the duties required by paragraphs 2A through 2C of Agreement).)

During their time as live-ins, Mr. Villa and Ms. Chavez inhabited an apartment at the Stead Manor complex. According to the Otis Report, the average reasonable cost per unit at Stead Manor for the two full years preceding their resignation, was $641.21 per month. (Otis Report 12, ECF No. 83-15 at 15.) Based on this valuation, Mr. Villa and Ms. Chavez's average hourly wage during their time as live-ins is estimated to be approximately $9.53 ($641.21 / 67.3 hours = $9.53), well in excess of the federally-required minimum wage of $7.25 per hour.

Therefore, Mr. Villa and Ms. Chavez have failed to present evidence sufficient to survive summary judgment, and their wage claims under the FLSA must be dismissed.

### c. State-Law Wage Claims

RHA also requests summary judgment on Plaintiffs' state-law wage claims, essentially arguing that Nevada often resorts to analogous federal law in wage-and-hour matters, and thus this Court should apply the same law to Plaintiffs' state-law claims as applied to their FLSA claims.

The question of whether Nevada employers can satisfy a portion of the state minimum wage requirement with the reasonable cost of providing lodging is a novel one. The parties have

not provided, nor has the Court found, any authoritative statement from any court or administrative agency regarding whether this type of in-kind compensation may be used to offset an employer's minimum wage obligation. To support its position that this practice is permitted under Nevada law, RHA cites to NRS 608.115, which reads, in pertinent part:

> **Records of wages.**
> 1.  Every employer shall establish and maintain records of wages for the benefit of his or her employees, showing for each pay period the following information for each employee:
>     *(a) Gross wage or salary other than compensation in the form of:*
>         *(1) Services; or*
>         *(2) Food, housing or clothing . . . .*

(Italics added.) However, this is simply a recordkeeping statute, instructing that an employer's payroll records need not reflect compensation paid to an employee in the form of services, food, housing, or clothing. While it demonstrates the Nevada legislature accepts the general practice of compensating employees with housing, it says nothing about whether the employer's cost of providing housing may be applied as an offset against the employer's minimum wage obligation.

Plaintiffs also discuss NRS 608.155, which clearly permits a wage credit in the case of employer-provided meals, but makes no mention of lodging:

> **Meals as part of wages or compensation; exception.**
> 1.  A part of wages or compensation may, if mutually agreed upon by an employee and employer in the contract of employment, consist of meals. In no case shall the value of the meals be computed at more than $1.50 per day. In no case shall the value of the meals consumed by such employee be computed or valued at more than 35 cents for each breakfast actually consumed, 45 cents for each lunch actually consumed, and 70 cents for each dinner actually consumed. . . .

Plaintiffs argue there is "no Nevada state law that allows for offsets for lodging or other 'in kind' payments to employees against the State Constitutional minimum wage. NRS 608.155 is limited to meals and does not apply to the constitutional minimum wage."

While NRS 608.155 does not provide a clear answer to the question raised here, its statutory history is relevant and quite informative. The statute that would become NRS 608.155

was originally found in the now-abrogated NRS Chapter 609, pertaining to the employment of women and minors. In 1975, ten years after the Nevada Legislature passed its state-law analog to the Civil Rights Act of 1964, Assembly Bill 219 was introduced to eliminate Chapter 609 and merge certain of its provisions into Chapter 608, pertaining to compensation, wages, and hours generally. The bill was inspired by a December 1973 lawsuit brought against the State of Nevada by the U.S. Department of Justice, which alleged that "certain Nevada statutes (in Chapter 609) require employers doing business in the State to establish and observe conditions of employment for females which are not required for males." Fact Sheet and Background Information for A.B. No. 219 at 3, available at https://www.leg.state.nv.us/Division/Research/Library/LegHistory/ LHs/1975/AB219,1975.pdf. In preparing A.B. 219, Assemblymen Jean Ford and James Banner noted: "In 1964, 40 states and the District of Columbia had maximum daily or weekly hours laws for women in specified occupations or industries. By 1973 all states but one (Nevada) had repealed the law or modified enforcement in light of Title VII of the Civil Rights Act of 1964." *Id.* at 4.

There is no doubt that Chapter 609 discriminated on the basis of sex. Purposed as a set of "protective" labor laws, the Chapter restricted and mandated various practices in the case of women which were not so restricted or mandated in the case of men. *See* Nev. Rev. Stat. § 609.030 (1965) (emphasis added) ("With respect to the employment of females in private employment in this state, it is the sense of the legislature that the health and welfare of female persons required to earn their livings by their own endeavors *require certain safeguards* as to hours of service and compensation therefor."). For example, the Chapter limited maximum work hours, mandated overtime compensation at time-and-a-half for all hours above eight in a thirteen-hour period, and required employers to ensure suitable seating, regular meal and rest periods, and a minimum hourly wage. See *id.* at §§ 609.040, 609.110, 609.120, 609.130. These

same protections were not provided to men. However, women were not generally supportive of Chapter 609 either; the additional obligations it placed on employers made it more difficult for women to be hired in the first place.

Most relevant to this case is NRS 609.070, which provided, in pertinent part:

**Payment of wages; food and lodgings as wages.**
[. . .]
2.   A part of such wages or compensation may, if mutually agreed upon by the female and her employer in the contract of employment, but not otherwise, consist of food and lodging or food or lodging. In no case shall the value of the food and lodging be computed at more than $2 per day. In no case shall the value of the meals consumed by such female employee, if lodging facilities are not accorded to her but meals only are purchased, be computed or valued at more than 35 cents for each breakfast actually consumed, 45 cents for each lunch actually consumed, and 75 cents for each dinner actually consumed. . . .

Viewed in its proper light as a protective statute, it is rather clear that this provision was not intended to authorize a practice, but rather to place limitations on a practice that was otherwise generally acceptable. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (Scalia, J.) (citations omitted) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."). In other words, it cannot be presumed that by including this provision in Chapter 609, the Legislature intended not to authorize credits against wages for food and lodging in the employment of men. Certainly, we do not read statutes to prohibit everything they do not expressly permit. Therefore, this type of in-kind compensation was surely permissible in the employment of men, only not subject to the monetary limitations prescribed in NRS 609.070.

With the passage of A.B. 219 in 1975, paragraph 2 of NRS 609.070 was abrogated, its language was amended, and it was recast as NRS 608.155. The statute reads the same today as

1   when originally enacted. The most, and only, significant change is the removal of any reference

2   to lodging. The import of that change is open to interpretation. For example, it could be said that

3   where a statute authorizes practices A and B, and is then amended to authorize only practice A,

4   practice B is no longer authorized (i.e., is prohibited). However, that conclusion is far less

5   reasonable than the conclusion that the Legislature never felt it needed to authorize wage credits

6   for food and lodging, but rather legislated on these matters purely for the purpose of imposing

7   limitations on the practice, especially when viewed in light of the Legislature's original

8   protective purpose in passing NRS 609.070.

9         The last piece of this statutory puzzle came last year, in 2017, when the Legislature

10  amended NRS Chapter 608 with the passage of Senate Bill 232, styled as the Domestic Workers'

11  Bill of Rights. The bill added a provision regarding wage credits for lodging, using substantially

12  the same language as NRS 608.155:

13        1.   A part of wages or compensation may, if mutually agreed upon by an
             employee and employer in the contract of employment, consist of lodging. In no
14        case may the value of the lodging be computed at more than five times the
             statutory minimum hourly wage for each week that lodging is provided to the
15        employee.

16  The bill also brought NRS 608.155 into the twenty-first century, by updating the monetary

17  limitations on meal credits which had remained unchanged in the law since 1975. *See* Nev. Rev.

18  Stat. § 608.155 (2018) ("In no case shall the value of the meals be computed at more than 100

19  percent of the statutory minimum hourly wage per day."). The bill went into effect on January 1,

20  2018.

21        The passage of S.B. 232 lends further support to the Court's initial conclusion that these

22  laws were never intended to authorize the taking of wage credits for food and lodging, but rather

23  to place limitations on a practice that was otherwise generally accepted. These provisions first

24  appeared in legislation designed to protect women in employment, and this latest addition comes

in the context of a bill designed to provide greater protections to domestic workers. In the proper context, it makes little sense to read the lodging provisions of S.B. 232 as granting a new advantage to employers; the only reasonable interpretation is that these provisions are intended to help workers (i.e., to place new limitations on a form of compensation already in common usage). Therefore, the Court concludes that there is no Nevada law prohibiting an employer from satisfying a portion of his minimum wage obligation by providing food or lodging. Furthermore, from 1975 to January 1, 2018, there were no state-law limitations on the amount an employer could claim as a wage credit by virtue of providing free lodging.

S.B. 232 perhaps raises an additional question. The new wage credit statute pertaining to lodging, effective this year, limits the credit to no more than "five times the statutory minimum hourly wage for each week that lodging is provided." Therefore, applying a minimum wage rate of $8.25, the maximum weekly credit an employer can now take is $41.25. Of course, RHA claims a much greater credit than that for the years during which Plaintiffs served as live-ins. However, the Court can easily dispose of the issue of S.B. 232's potential retroactive effect. In passing the bill, the Legislature clearly did not manifest an intent that its provisions be applied retroactively. The bill simply provides that it will become effective "[o]n January 1, 2018, for all . . . purposes." As the Nevada Supreme Court has noted, this type of statement "does not even begin to approach the type of express legislative command necessary to rebut the presumption against retroactivity." *See Sandpointe Apts. v. Eighth Jud. Dist. Ct.*, 129 Nev. 813, 313 P.3d 849, 858 (2013). Moreover, the assignment of such a low monetary value to a week of free lodging, after more than forty years of non-regulation, would be patently unfair if applied retroactively. *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.*

Having reached the conclusion that lodging credits against minimum wages are not prohibited by Nevada law, the Court is confronted with the fact that Nevada law provides little to no guidance on this issue. In such a case, it is appropriate to apply the standards of federal law, thus, the standards of the FLSA. There is certainly nothing in the Nevada Revised Statutes that would require a departure from federal law on this matter. *See Terry v. Sapphire Gentlemen's Club*, 130 Nev. Adv. Op. 87, 336 P.3d 951, 956 (2014) (observing that the Nevada Supreme Court has been willing to "part ways with the FLSA where the language of Nevada's statutes has so required"); *see also Rite of Passage, ATCS/Silver State Acad. v. State, Dep't of Bus. & Indus., Office of Labor Com'r*, No. 66388, 2015 WL 9484735, at *1 (Nev. Dec. 23, 2015) ("As Nevada law provides little guidance on this issue, we turn to the federal courts' interpretation of hours worked under the federal Fair Labor Standards Act."). As the Nevada Supreme Court has stated, where there is "no substantive reason to break with the federal courts on [an] issue, judicial efficiency implores us to use the same test as the federal courts under the FLSA." *Terry*, 336 P.3d at 957 (citation omitted).

Therefore, because the evidence in this case does not support a reasonable inference that a wage violation has occurred under the FLSA, and because the average hourly wages of Mr. Roces, Mr. Villa, and Ms. Chavez exceed even the highest minimum wage rate under Nevada law ($8.25), the Court grants summary judgment for RHA on Plaintiffs' state-law wage claims.[7]

### d. Mr. Roces's Individual Claims

Lastly, Mr. Roces has brought three claims arising from the alleged retaliatory conduct of RHA: FLSA retaliation in violation of 29 U.S.C. § 215(a)(3), discrimination and retaliation in violation of NRS 613.480(4), and tortious discharge in violation of public policy. Precisely the

---

7 As discussed above, the state-law wage claims of Mr. and Mrs. Lopez are barred by the applicable statute of limitations.

1    same allegations support all three claims. Mr. Roces alleges that he complained about his

2    compensation to RHA Assistant Housing Manager Tsige Haile, on two separate occasions, in or

3    around July 2015. Following the meetings, Mr. Roces received an uncharacteristic number of

4    disciplinary write-ups in quick succession, and was then terminated on August 11, 2015, the

5    same day he filed this action.[8] (Second Am. Compl. ¶¶ 39–42, ECF No. 54.)

6        The parties concede, and the Court agrees, that the *McDonnell-Douglas* burden-shifting

7    framework applies to Mr. Roces's FLSA and Nevada-law claims. (Def.'s Mot. Summ. J. 27–30,

8    ECF No. 82; Resp. 33–37, ECF No. 101.) *See Mejia v. Motel 6*, No. CV-98-07134, 2001 WL

9    681782, at *16 (Nev. Dist. Ct. Jan. 24, 2001), *aff'd in part, rev'd in part sub nom. Pope v. Motel*

10    *6*, 121 Nev. 307, 114 P.3d 277 (2005) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.

11    1987); *Vandermeer v. Douglas County*, 15 F. Supp. 2d 970, 984 (D. Nev. 1998) (Reed, D.J.).

12    Under that framework, a plaintiff must first establish a prima facie case of retaliation. *Chuang v.*

13    *Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). "The burden of

14    production, but not persuasion, then shifts to the employer to articulate some legitimate,

15    nondiscriminatory reason for the challenged action." *Id.* at 1123–24. If the employer satisfies its

16    burden, the plaintiff must then offer "specific and substantial" evidence of pretext. *Bergene v.*

17    *Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

18        To state a prima facie claim of retaliation, a plaintiff must show: 1) that he engaged in a

19    protected activity; 2) that he then suffered an adverse employment action; and 3) that there is a

20    causal link between the protected activity and the adverse employment action. *See Payne v.*

21    *Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). Generally, a "protected activity" includes

22

23

24

---

8   Mr. Roces points to no evidence in the record suggesting RHA knew or could have known about this lawsuit at the time of Mr. Roces's termination. Therefore, the Court construes the retaliation claims to be based solely on the verbal complaints made in meetings with RHA management.

"protesting an unlawful employment practice." *See Trent v. Valley Electric Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). To constitute protected activity, such protest need not be "lodged with absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015). However, it must at least comprehensibly communicate that the opposed conduct "fairly fall[s] within the protection" of the law. *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).

In the FLSA context, the Ninth Circuit has held that protected activity includes informal complaints about unlawful wage-and-hour practices, whether oral or written, presented to the employer itself. *See Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999). However, to find protection under the FLSA, "an employee must actually communicate a complaint to the employer." *Id.* In other words, "there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the [FLSA]," and therefore "not all abstract grumblings [about wages] will suffice." *Id.* (quoting *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44 (1st Cir. 1999)). The Ninth Circuit has not described the "minimum specificity with which an employee must assert an alleged FLSA violation," but has stated that "so long as an employee communicates the *substance* of his allegations to the employer (e.g., that the employer has failed to pay adequate overtime, or has failed to pay the minimum wage), he is protected." *Id.* at 1008 (emphasis in original).

Here, the entirety of Mr. Roces's evidence regarding his wage-related complaints to RHA is found in his deposition testimony:

> Counsel for RHA: Now, the person, which person or persons did you register your complaint with about the Fair Labor Standards Act?
>
> Mr. Roces: I first complained about it in a meeting with Mishon Hurst, Sally Rosen, and Tsige in Tsige's office.

1    Q: That's the first time you complained?

2    A: Yes.

3    Q: About the Fair Labor Standards Act?

4    A: Yeah. I stated about my hours --

5    Q: That is a yes or no.

6    A: Yes.

7    Q: I'm going to ask you to tell me the words that you employed to register that complaint? What did you say to them?

8    A: I stated the hours I was working, that it was beyond what the contract allows for, and that I was not being compensated fairly for those hours.

9    Q: Did you say anything else?

10    A: That was it. The response I received --

11    Q: Stop. I didn't ask you that.

12    A: Okay.

13    Q: Did you complain again about not—being overworked and underpaid?

14    A: Yes. Approximately two weeks after that meeting in Tsige's office after one of our morning meetings, going over the reports.

15    Q: Did you complain after that again?

16    A: No, I did not.

17    Q: What were the words you used to complain to Mr. Haile about your compensation?

18    A: That, again, I was not being compensated fairly for my hours. He stated that I signed a contract and that was binding, and then I pointed to the Department of Labor posters on his office wall, and specifically to the FLSA issue.

19    Q: The Fair Labor Standards Act issue?

20    A: Yes.

21    Q: Did you say anything else during the course of that meeting?

22    A: No.

23    Q: About the Fair Labor Standards Act?

24

1    A: No. I left after that as I was upset.

2    Q: So the answer was no?

3    A: Yes.

4    Q: Did you complain again to anyone else at Reno Housing other than this
     meeting with Mishon, Sally, Tsige, and yourself, and then the meeting with
     Tsige?

5

6    A: No.

7    (Roces Dep. Vol. II 91:21–93:20, ECF No. 88-2.) Mr. Roces testified that he made two oral

8    complaints to RHA about his compensation. In both instances, he stated he was not being

9    compensated "fairly" for the amount of work he was required to do. At the end of the second

10   discussion, he pointed to some "Department of Labor posters" on the office wall, and

11   "specifically to the FSLA issue." When he pointed, he made no verbalization, and said nothing

12   more before leaving the office.

13          This evidence is insufficient to establish a prima facie case that Mr. Roces engaged in

14   protected activity. An employee must at least say enough to put an employer on notice that the

15   employee believes the employer is violating a law. There is a great difference between saying

16   "you are not paying me what I deserve," or "you are not paying me fairly," and saying "you are

17   not paying me *legally*." The closest Mr. Roces came to referring to any law was a silent gesture

18   toward a Department of Labor poster hanging on the wall, with no further discussion or

19   explanation. This act is far too ambiguous to constitute a complaint filed with the employer,

20   under the FLSA or Nevada law.

21          The case law is in accord.[9] In *Valerio*, the plaintiff wrote a letter to her supervisor stating

22   that she was misclassified as exempt under the FLSA, and was entitled to overtime pay. 173 F.3d

23

24   _____

     9  The Court notes that while Mr. Roces claims his complaints were protected activity, he has not
     cited to any relevant analogous case law to support his position.

at 45. In *Lambert*, the plaintiffs made an oral complaint about their employer's failure to pay adequate overtime wages, and specifically alleged a violation of the FLSA (in addition to taking other action). 180 F.3d at 1007. In *EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992), the plaintiff complained of unlawful sex discrimination and told her employers they were "'breaking some sort of law' by paying her lower wages than previously paid to male temporary custodians." These complaints were sufficient to receive the protections of the law. Of course, Mr. Roces need not have referred to the FLSA or Nevada statutes by name; however, in contrast to the foregoing cases, he did not communicate the substance of his allegations to RHA. Did he believe his in-kind compensation was unlawful or inadequate under the FLSA? That he was not receiving at least the minimum wage? That he was entitled to overtime pay? Perhaps he believed that RHA was in breach of its contract with him. Or perhaps he was simply unsatisfied with his arrangement and felt he deserved to be paid more for his time. His complaint is insufficient to answer these questions, and is thus insufficient to constitute protected activity. A reasonable person in the position of RHA management would not understand from Mr. Roces's complaints that he believed he was an employee of RHA, entitled to the protections of federal and state labor laws, and that RHA was not complying with those laws.

Therefore, the Court grants summary judgment to RHA on Mr. Roces's individual claims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiffs' motion for partial summary judgment (ECF No. 81) is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (ECF No. 82) is GRANTED.

IT IS SO ORDERED. *MARCH 27, 2018.*

_____
ROBERT C. JONES
United States District Judge